IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

JUN 2 8 2000

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

:............................................x

Jibril Koita, Galdwin Wilson,                    :
Omari Maher, Saleh Sharif,                        :
Celio De La Cruz and Anh Le,                      :

                    Petitioners,     :

        -v-                              :   CIVIL NUMBER:
                                 **1: CV-00-0070**
Janet Reno; United States Attorney             :   **(Judge Cadwell)**
General,                                          :
                                   Pres'd Bellsario
        Respondent.                      :

:............................................x

## ADDENDUM

    **COMES NOW** Omari Maher, petitioner and pro-se hereby respectfully moves this Honorable Court to dismiss respondent's reply to the Court Order to Show Cause on the ground that mandatory detention under **Section 1226(c)** of **AEDPA** as unconstitutional both on its face and as applied, violating petitioner's Fifth Amendment substantive and procedural Due Process rights, as well as the Eight Amendment prohibition against excessive bail.

    All the petitioner raised lacked merits because of the these reasons:

    Petitioner Omari Maher has been detained under the custody of Immigration and Naturalization Service (INS) for one (1) year after serving his sentence.

On or about May 10th, 1999, petitioner was ordered deported, but requested relief under **241(B)(3)** of the Act.  The Asylum Officer found that petitioner had a reasonable fear of torture.

On or about July 26th, 1999, the Asylum Officer referred petitioner case to an Immigration Judge.  See **(Exhibit #B)**.

The Immigration Judge granted petitioner witholding of removal under **Section 241(B)(3)** of the Act.  See **(Exhibit #C)**.

On or about October 14th, 1999, INS served timely Appeal to the Judge's decision.  See **(Exhibit #D)**.

On or about May 24th, 2000, the Immigration Judge granted petitioner again under torture convention.  See **(Exhibit #E)**.

On or about June 1st, 2000, the INS Appeal the Judge's decision again.  See **(Exhibit #F)**.  INS appeal both decision on October 14th, 1999 and June 1st, 2000, see copies **supra**.

Petitioner has met his burden of proof with his substantive due process defense to his removability.  Given the very slim likelihood that petitioner remain under INS custody.

Being detained in Snyder County Prison, Selinsgrove, PA., pending the outcome of INS appeal both times.  Petitioner stated that mandatory detention does not violate petitioner's due process rights.

Petitioner has family ties in the United States of America, a sick mother who needs petitioner's help with her unfortunate hardship.

Petitioner has continued to assist the United States government by testifying against his fugitive co-defendant.  See **(Exhibit #G)**.

Petitioner does not poses any danger to the community consider by INS, as well as Immigration Judge, it is not a serious crime by a case by case determination, petitioner has a present address to live with his mother.  See **(Exhibit #H)**.

Petitioner will have a job during his staying with his mother. See **(Exhibit #I)**.

Petitioner the Jordanian who obtained witholding or removal twice, has presented a substantive defense.  Petitioner overlooked the fact that INS appealing petitioner witholding of removal, without a bond or provision of review, may result toa long-term or prolonged detention.

Petitioner remains in INS custody being detained in the Snyder County Prison, Selinsgrove, PA., pending the outcome of the INS second appeal.

Petitioner has a family ties in the United States, a mother who is sick and has no income, waiting for her son to come home. See **(Exhibit #J)**.  Petitioner also have a job waiting.  See **(Exhibit #K)**;  **(Exhibit #L)**; and **(Exhibit #M)**.

Petitioner does not pose any danger in the community, petitioner is not serious crime withheld by Immigration decisions both times.

It is the best interest of the United States government to have space available during the release under bond or parole.

Petitioner has raised substantive defense to his removability to his native land.  Additionally, the government's interest in efficient administration of Immigration laws at the border also is weighty **"Plasencia, 459 U.S. at 34.**  However, the Court believes that

the case at bar presents different factual circumstances and different issues in **Plasencia**, the petitioner was a permanent resident alien who had left the United States for a period of time and who upon her return was subject by statute, to an exclusion hearing she was challenging the due process of the exclusion hearing, also petitioner has a petition pending in the Court, INS **I-130**.  See (**Exhibit #N**).

In the case at bar, petitioner is challenging his prolonged detention, petitioner does not seek to challenge his order of deportation or to reinstate his permanent resident alien status, petitioner is only seeking to be released from confinement pending his removal.

Therefore, to consider petitioner while in detention to be at the border or outside the United States, would be a fabrication.

The right of a nation to expel or deport foreigners . . . is a absolute and unqualified, as the right to prohibit and prevent their entrance into the country.  See **Fong Yue Ting v. United States**, **149 U.S. 689, 707, 13 S.Ct. 1016, 37 L.Ed. 905 (1893)**.  It is also true that the exclusion of aliens is a fundamental act of national sovereignity "that" stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.  See **United States ex. rel. Knauff v. Saughnessy**, **338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. (1950)**; see also **Janet Reno, Attorney General, et al. v. American-Arab Anti-Discrimination Committee et al.**, **525 U.S. --, 142 L.Ed.2d 940, 119 S.Ct. --(1998)**.

However, prolonged detention after a final order of deportation is not the same as deportation or even exclusion.  Accordingly, the government's interests are not plenary.  See **Phan, 56 F.Supp.2d** at **1155.**  The plenary power doctrine supports judicial deference on substantive immigration matters, but not post deportation order detention as indefinite detention of deportable aliens is not a matter of immigration policy.

Prevention of light and protection of the community pending deportation or domestic interests, rather that international concerns.  The INS authority to detain aliens only for a reasonable time beyond the statutory removal period.

Petitioner already been detain for one (1) year in cases in which an alien has already entered the United States and there is no reasonable likelihood that a foreign government will accept the alien's return in the reasonably foreseeable future, because if petitioner return to his native country petitioner will be tortured, also no country will accept petitioner except the United States.

**WHEREFORE** petitioner overlooked the fact that INS appending petitioner witholding of removal without provision of parole may result to long term detention.

For all the reasons stated above, and for the spirit of justice petitioner respectfully request that this Honorable Court grant him Bond pursuant to **8 C.F.R. § 241.4,** Continued Detention Beyond The Removal and order his immediate release pursuant to **8 C.F.R. § 241.5.**

Respectfully Submitted,

Omari Maher, pro-se
Register No. 99-00350
Snyder County Prison
600 Old Colony Road
Selinsgrove, PA. 17870-8610
Unit A-3.

## CERTIFICATE OF SERVICE

I, Omari Maher, hereby certify that a copy of the foregoing motion was mailed on this June day of 23, 2000, to the opposing party at:

To:  Mary Catherine Frye
     Assistant U.S. Attorney
     228 Walnut Street
     Harrisburg, PA. 17108

/s/ _____
     Omari Maher
     Register No. 99-00354

IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jibril Koita, Galdwin Wilson,          :
Omari Maher, Sakeh Sharif,             :
Celio De La Cruz and Anh Le,           :

                Petitioners,   :

           v.                         :     CIVIL NUMBER:
                                     1: CV-00-0070
Janet Reno;   United States Attorney   :     (Judge Cadwell)
General,                               :

           Respondent.                :

**AFFIDAVIT IN SUPPORT OF MOTION FOR
EXPEDITED HEARING**

    I, Omari Maher, petitioner and pro-se hereby submits this
affidavit in support of motion.

    Petitioner states that the facts set forth in the foregoing
are true and correct to the best of his knowledge, information and
belief.

    On this _23rd_, day of _June_, 2000, before me, a Notary
Public for the Snyder County Prison, the undersigned officer,
personally appeared _Maher Omari_, known to me, or satisfactoril
proven, to be the person whose name is subcribed to the above instrume
and acknowledged that she executed the same for the purposes therein
contained.

    I witness whereof, I have hereunto set my hand and official
seal.

_Sylvia C. Brown_

Notarial Sea
Sylvia C. Brown
Selinsgrove Bo...

                                  _Omer_
                                 Notary Public.
                                 MAHER OMARI

EX # B

## REASONABLE FEAR OF PERSECUTION
## OR TORTURE DETERMINATION

ALIEN NUMBER: A 76 766 772

NAME: OMARI, Maher

COUNTRY: Jordan

DATE: July 19, 1999

ASYLUM OFFICER: J.L. Reaves, ZNK05

REVIEWING SAO: Steve Heller, ZNK07

LOCATION: York County Prison

### I. BIOGRAPHIC/ENTRY INFORMATION

The applicant indicated that he is a 34-year-old male native and citizen of Jordan. File data indicates that he entered the United States at New York, NY, on November 10, 1989, and was admitted as a student (non- immigrant) for military training. The applicant was convicted on October 20, 1998 of Conspiracy to defraud the government and sentenced to 20 months confinement. He was detained at the Allenwood Detention Facility and received a final administrative removal order on 05/10/99.

### II. BASIS OF CLAIM

The applicant fears that he will be persecuted and tortured by the government of Jordan or by groups the government is unwilling or unable to control on account of membership in a particula social group (couples suspected of adultery or fornication in Jordan).

### III. SUMMARY OF TESTIMONY

The applicant testified that he was a Police Officer in the capital city of Amman, Jordan, and had been on the force since 1984. His father was a senior Officer in the Jordanian Army. Durin 1989, the applicant stated that he fell in love with his third cousin. However, she was a Sunni Moslem and the applicant was a Shi'ia Moslem. The girl's family objected to the relationship and demanded they break-up. The applicant stated that her family immediately contracted her i marriage to another man. On August 11, 1989, he decided to rescue the young lady and devised a plan to extract her from the family home. He gathered his police unit around midnight, telling them that the girl's village held a criminal, which he wanted to apprehend. While they blocked the roads, the applicant and his brother went in and pick up the girl at a prearranged location at the back of her father's home. They managed to escape and they spent the night in a hotel in a neighboring village. He returned to his police unit two days later and was arrested, and charged with kidnapping. He was detained for 15 days. During this time, the girl's family arranged an examination, which showed she was no longer a virgin. Having had sex with the applicant, the

girl had comprised the family's honor and was later killed for this reason, according to the applicant. Fearing for her son's safety, his mother made arrangement with a friend, who was a Colonel in the Army for him to leave Jordan.

## IV. CREDIBILITY

Some items in the applicant's file show an arrival date to the U.S. as November 1984, however, he gave his arrival date of 1989. The applicant's testimony was believable, consistent with other documents in the file and sufficiently detailed. He was found to be credible.

## A. CLAIM BASED ON PERSECUTION

## I. FOCUSED ANALYSIS COMPONENT

To establish a reasonable fear of persecution, the applicant must establish that there is a reasonable possibility that he would persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion. To establish a reasonable fear of torture, the applicant must establish that there is a reasonable possibility that he or she would be subjected to torture, as defined in the Convention Against Torture and U.S. regulations, in the country to which he or she was ordered removed.

## II.      PAST PERSECUTION

Persecution has been defined as a threat to life or freedom or other serious human rights violation on account of race, religion, nationality, membership in a particular social group, or political opinion. Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status, para. 52 (Geneva, 1979). The PA was detained for 15 days, and the charges were dismissed. This was not found to be persecution.

## III. FEAR OF FUTURE PERSECUTION

The applicant testified that he did indeed have sexual relations with his then girlfriend in 1989. He stated that when his and her family discovered their liaison, they were immediately accused of dishonoring both families. Her own family, in what is known as an "honor Killing" killed his girlfriend in 1989. The applicant feels that he also would be in danger if he returns to Jordan. This view is supported by country condition reports.

According to the **U.S. STATE DEPARTMENT (1997)**, *"The Criminal Code allows leniency for a person found guilty of committing a crime of honor, a euphemism that refers to a violent assault against a female by a male relative for alleged sexual misconduct. Law enforcement treatment of men accused of honor crimes reflects widespread unwillingness to condemn or take action against the problem. The press reported 24 such cases in 1997. However, these figures*

*likely understate the actual number of cases, as most crimes of honor are not reported by the press. The actual number of honor crimes is believed by a local expert to be 4 times as high. T[...] police regularly imprison women who are liable to become victims of honor crimes for their ov[...] protection...According to the law, a crime of honor defense may be invoked only by the defendant who surprises his wife or any close female relative in the act of adultery or fornication, in which case the male perpetrator of the honor crime is not guilty of murder. Though few defendants can meet the stringent requirements for a crime of honor defense, whic[...] require that the defendant must personally have witnessed the female victim engaging in sexua[...] intercourse, they are not tried for murder and convicted offenders rarely spend more than 2 years in prison."*

 This was again covered by **TIME** magazine in a January 1999 article.  The article went a bit further to say that the government of Jordan "winks" at honor killings.
Also, the applicant's father is a high ranking Officer in the Jordanian Army.  The father feels th[...] his son, the applicant has disgraced his family and has threatened to kill the applicant.  It appea[...] that the father, in his position in the military, may be able and willing to harm the applicant.  T[...] family of the applicant's girlfriend has already demonstrated that they are willing and able to cause harm in the name of honor.  They killed their own family member.  There exists a reasonable possibility that the applicant may be persecuted if he returns to Jordan, on account [...] his membership in a particular social group.


## VI. BARS

In general, mandatory bars automatically preclude an applicant from receiving asylum or withholding.  In this case, even though the applicant is an aggravated felon, these bars were no[...] considered in making the reasonable fear of persecution decision.


## B.  DECISION

The applicant has established a reasonable fear of persecution if he returns to Jordan on accoun[...] of his membership in a particular social group.



# UNITED STATES DEPARTMENT OF JUSTICE
## IMMIGRATION AND NATURALIZATION
### RECORD OF SWORN STATEMENT

Office:  Newark Asylum Office                    File No: 76 766 772

Statement by:  Maher OMARI

In the Case of: Torture reasonable fear

Attorney: Susan WEBER, Esq.

At: York, PA                              Date: July 12, 1999

Before:   Asylum Officer (Name and Title): James L. Reaves

In the: English language.

Interpreter: N/A


    My name is James L. Reaves, I am an officer of the United States Immigration and Naturalization Service, authorized by law to administer oaths and take testimony in connection with enforcement of the Immigration and Nationality laws of the United States.   I am here to take your sworn statement regarding your request for protection from removal to Jordan.

The purpose of this interview is to determine whether you should be referred to an immigration judge to apply for withholding or deferral of removal.   You will be eligible for such a referral if the INS finds that there is a reasonable possibility you would be persecuted or tortured in the country to which you have been ordered removed.  I am going to ask you questions about why you fear returning to the country to which you have been ordered removed, or any other country.  It is very important that you tell the truth during the interview and that you respond to all of my questions.  This may be your only opportunity to give such information.  Please feel comfortable telling me why you fear harm.  US law provides strict rules to prevent the disclosure of what you tell me today about the reasons you fear harm. The information you tell me about the reasons for your fear will not be disclosed to your government, except in exceptional circumstances.  The statements you make today may be used in deciding your claim and in any future immigration proceedings. It is important that we understand each other.  If at any time I make a statement you do not understand, please stop me and tell me you do not understand so that I can explain it to you.  If at any time you tell me something I do not understand, I will ask you to explain.


Q.    Do you have any questions about what I have explained to you?
A.    No, Sir.

Q.    Do you wish to have a lawyer or any other person present to advise you?

1

A.    Yes, My attorney is present.

Q.    Are you willing to answer my questions at this time?
A.    Yes, I am.

Q.    Do you swear or affirm that all the statements you are about to make will be the truth, the whole truth and nothing but the truth?
A.    Yes I do.

Start of Interview

Q:    What is your complete name?
A:    Maher OMARI

Q:    What country are you from?
A:    Jordan.

Q:    When did you leave Jordan?
A:    I left in 1989.

Q:    What did you do for a living there?
A:    I was a police officer.

Q:    Since when?
A:    Since 1984, in the capital of Aman, then I transferred to the north in 1986 and back to Aman 6 months later.

Q:    As a police officer, what were your duties?
A:    I work in an anti-terrorist office, which protected government facilities.

Q:    Why did you leave the police?
A:    I left because I was having problems with the tribal law of Jordan. In 1989, I fell in love with my third cousin and the family disagreed to the engagement. They are Sunni Moslem and I am a Shi'ia.

Q:    What kind of problem did this present for you?
A:    I accepted their decision, and she called me and told me the she was being forced to marry someone else. This happened on August 11, 1989. I went to her village around midnight with some other members of the police force. I had told them that there was a wanted person in the village. The police blockaded the road while I went into the village with my brother. She was waiting behind the fence of her father's house. We got into a car and drove out of the village.  I told the police that I did not find the person I was looking for and told them to go home. I rented a room in my brother's name in a village about 55 miles Aman and her village.

Q:    Then what happened?
A:    I made sure she was secure in the hotel, spent the night with her and went to my job the second day. Somehow my father knew what had happened (he was a Star Marshall in the Jordanian Army).

Colonel

Q:    How did your father find out?

2

A:    He found out through my girlfriend's younger brother. He told his father that I had taken his sister thru the back door. The father told his wife. His wife called my mother.

Q:    Then what happened?
A:    I went to my unit. My supervisor came in and disarmed me, saying he wanted to talk to me in his office. My father was on the speaker phone. He asked where I was last night, he showed me the logbook. I lied to him, saying nothing had happened. My father called me a liar from the phone, saying no one was wanted from the village, saying he knew everything. They talk to me for several hours and was arrested 3 hours later. My brother told them she was at the hotel.

Q:    Were you detained?
A:    I was detained for 15 days in Aman, in the police department.

Q:    What happened next?
A:    My mother was worried about me because of the tribal laws about honor. My father did not want to become involved because of his high position. There were rumors that I had had sex with my girlfriend. Relatives told me that the whole village was talking about it. In Jordan, having sex before marriage violates the honor and dignity of the entire family.

Q:    What happened next?
A:    My girlfriend was placed under the protection of the police because of the rumors. If she was freed, she would be killed by her tribe an honor killing. She was taken to a doctor to determine if she was a virgin, since fornication is against the law in Jordan.

Q:    What is the punishment for fornication in Jordan?
A:    For the man it is not so serious. If he marries her, they drop the charges, the government does, but under the tribal laws, the woman would be killed. Under tribal law, the man is also shot.

Q:    What were the results of the examination?
A:    It showed she was not a virgin, she confessed that we did have sex on that night.

Q:    What did you do then?
A:    I contacted my mother, she had a colonel friend in the police department. He dismissed the charges and I was released from detention. My father did not know and my mother did not go back to my father's house. After I was released from detention, my mother told me I had to leave Jordan. The colonel helped me to obtain documents and I got a visa from the US Embassy. I left Jordan on November 17, 1989, coming to the United States.

Q:    Why did you leave Jordan?
A:    I fear for my life. I read (in the newspaper) that my girlfriend had been killed by her family in 1989, I think it was during December of the same year.

Q;    What do you think would happen if you returned to Jordan?
A:    I would be killed. My mother had an affair with the Colonel who helped me so they both had to leave Jordan also.

Q:    Why do you think you would be killed?

3

(Rev. 3/22/00)

A:    Because of honor killing, and I am a Shi'ia.  The government would punish me because I left my job and did not come back.  My father has threaten to kill me (shot me) because I have disgraced the family twice, by having sex with my girl friend and causing he and my mother to divorce.

Q:    Do you know of others who have been killed for this reason in Jordan?
A:    Yes, because I am with the police force, I know of 15 or 20 women who have been killed.  This was on CNN recently.

Q:    The CNN report did not mention what happen to the men, it did not say they were jailed or killed, what happens to them?
A:    The women are killed, the men are killed or tortured by the family (tribe).

Q:    Could they simple move to another part of Jordan?
A:    Jordan is small, you cannot hide myself.  I used to be a policeman, I am known it would be a problem for me.  The government knew I would be kill when they released me.  They wanted no problems with the tribes, so they would not protect me.

Q:    Could your mother validate your story?  Do you have anything from her?
A:    No, but I could get something. I could get a statement from her.

Q:    You stated earlier that this happened with your girl friend during August 1989.  You did not leave Jordan until November 1989. All charges were dropped by the government.  The tribes did not harm you during this time, why not?
A:    I went into hiding after I was released.  I hid in village 75 miles away from Aman.

Q:    When did you get the visa?
A:    During October 1989, in Aman, Jordan.

Q:    But you said you were in hiding, 75 miles away. How did you get the visa?
A:    I was well respected in Jordan, I had been to the U.S. in 1983. I knew the procedures. I still had my credientials. I went in person in uniform and got the visa.

Q:    It's been 10 years, do you think you would still be injured or killed if you returned?
A:    Yes.  My brother left also in 1989, but he went back to Yemen, he is struggling there but he cannot go back to Jordan.  My father has a new wife and he does not care about us any more.

Q:    Yes, but why do you think the tribal laws would against you after all this time?  Has there been any indication?
A:    They are allowed to have guns, honor and dignity are very important to them, they do not forget. They remember for generations.

Q:    Is there anything else you would like to add?
A:    I would like to say that if I am to be deported, I would like to be deported anywhere except Jordan.  My life would be in danger there.  My mother is here and I am the only support she has here. She is sick, and can hardly walk.

Q:    To the attorney, Ms. Weber, is there anything you would like to add?

A:     He said he was shot while in hiding during September 1989. Because it shows he has already been injured by some one for the tribes.

Q:     Did you see the person that shot you?
A:     Yes, I heard 2 shots, one hit me in the leg. I saw and one of the people.

I have read (or have had read to me) the foregoing statements, consisting of ........Pages. I state that the answers made therein by me are true and correct to the best of my knowledge and belief and that this statement is a full, true, and correct record of my interview on the date indicated by the above-named officer of the Immigration and Naturalization Service. I have initialed each page of this statement and the correction(s) noted on page(s) .........

_____
Signature

Subscribed and sworn before me at .....York City Prison..... on .....7/12/99.....

.................................................. [Signature]

.................................................. [Printed Name]

Officer, United States Immigration and Naturalization Service

Witnessed by:

..................................................... [Signature]

..................................................... [Printed Name]

**U. S. Department of Justice**
Immigration and Naturalization Service

# Notice of Referral to Immigration Judge

| | |
|---|---|
| **Date** | 7/26/99 |
| **A-File** | 76766772 |

| **Name** OMARI, Maher | **Country of Citizenship** Jordan |
|---|---|
| **Place and Manner of Arrival** NYC, by air | **Date of Arrival** 10/17/89 |

**To immigration judge:**

☐ 1. The above-named alien has been found inadmissible to the United States and ordered removed pursuant to sec
235(b)(1) of the Immigration and Nationality Act (Act). A copy of the removal order is attached. The alien has requ
asylum and/or protection under the Convention against Torture and the matter has been reviewed by an asylum o
who has concluded the alien does not have a credible fear of persecution or torture. The alien has requested a revi
that determination in accordance with section 235(b)(1)(B)(iii)(III) of the Act and 8 C.F.R. §§ 208.30(e) and (f).

☐ 2. The above-named alien arrived in the United States as a stowaway and has been ordered removed pursuant to s
235(a)(2) of the Act. The alien has requested asylum and/or withholding of removal under the Convention against
Torture and the matter has been reviewed by an asylum officer who has concluded the alien does not have a credib
of persecution or torture. The alien has requested a review of that determination in accordance with section
235(b)(1)(B)(iii)(III) of the Act.

☐ 3. The above-named alien arrived in the United States in the manner described below and has requested asylum a
withholding of removal under the Convention against Torture. The matter is referred for a determination in accord
with 8 CFR 208.2(b). Arrival category (check one):

    ☐ Crewmember/applicant    ☐ Crewmember/refused    ☐ Crewmember/landed
    ☐ Crewmember/violator    ☐ VWPP/applicant    ☐ VWPP/violator
    ☐ 235(c) order    ☐ S-visa nonimmigrant    ☐ Stowaway: credible fear determination at

☐ 4. The above-named alien has been ordered removed by an immigration officer pursuant to section 235(b)(1) of the
A copy of the removal order is attached. In accordance with section 235(b)(1)(C) of the Act, the matter is referred fo
review of that order. The above-named alien claims to be (check one):
    ☐ a United States citizen        ☐ a lawful permanent resident alien
    ☐ an alien granted refugee status under section 207 of the Act    ☐ an alien granted asylum under section 208 of t

☐ 5. The above-named alien has been ordered removed pursuant to section 238(b) of the Act, or the INS has reinstat
prior exclusion, deportation, or removal order of the above-named alien pursuant to section 241(a)(5) of the Act. A
of the removal order and, if applicable, the notice of reinstatement, are attached. The alien has expressed fear of
persecution or torture and the claim has been reviewed by an asylum officer who has concluded the alien **does not**
a reasonable fear of persecution or torture. The alien has requested a review of that determination in accordance w
C.F.R. §§ 208.31(f) and (g).

☑ 6. The above-named alien has been ordered removed pursuant to section 238(b) of the Act, or the INS has reinstat
prior exclusion, deportation, or removal order of the above-named alien pursuant to section 241(a)(5) of the Act. A
of the removal order and, if applicable, the notice of reinstatement, are attached. The alien has expressed fear of
persecution or torture and the claim has been reviewed by an asylum officer who has concluded the alien **has** a
reasonable fear of persecution or torture. The matter has been referred for a determination in accordance with 8 C
208.31(e).

## NOTICE TO APPLICANT

You are ordered to report for a hearing before an immigration judge for the reasons stated above. Your hearing is sched
on

_____ TBA _____ At _____ TBA _____   You are to appear at _____
     **(Date)**              **(Time)**

York County Prison, 3400 Concord Rd. York, PA 17402
**(Complete office address)**

☒ You may be represented in this proceeding, at no expense to the government, by an attorney or other individual
   authorized and qualified to represent persons before an Immigration Court. If you wish to be so represented, your
   attorney or representative should appear with you at this hearing. In the event of your release from custody, you m
   immediately report any change of your address to the Immigration Court on Form EOIR-33, which is provided with
   notice. If you fail to appear for a scheduled hearing, a decision may be rendered in your absence.

☒ You may consult with a person or persons of your own choosing prior to your appearance in Immigration Court. Su
   consultation is at no expense to the government and may not unreasonably delay the process.

☒ Attached is a list of recognized organizations and attorneys that provide free legal service.

_____
**(Signature and title of immigration officer)**

## CERTIFICATE OF SERVICE

The contents of this notice were read and explained to the applicant in the _____ English _____ language.

The original of this notice was delivered to the above-named applicant by the undersigned on _____ and the alien has been advised
communication privileges pursuant to 8 CFR 236.1(e).

_____
**(Signature and title of immigration officer)**

**Attachments to copy presented to immigration judge:**

☐ Passport

☐ Visa

☐ Form I-94

☐ Forensic document analysis

☐ Fingerprints and photographs

☒ EOIR-33

☐ Form I-860

☐ Form I-869

☐ Form I-898

☒ Asylum officer's reasonable fear determination worksheet (I-899)

☐ Asylum officer's credible fear determination worksheet (I-870)

☐ Other (specify): _____

*Ex # C*

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
YORK, PENNSYLVANIA 17402

<u>IN THE MATTER OF</u>

OMARI, Maher
(RESPONDENT)

**GROUNDS OF REMOVAL:** Aggravated felon

**ON BEHALF OF RESPONDENT**

Susan M. Weber, Esq.
2555 Kingston Road, Ste 260
York, PA 17402

IN SECTION 238(b)REMOVAL
PROCEEDINGS

**CASE# A 76 766 772**

**ON BEHALF OF INS**

Jeffrey Bubier
Assistant District Counsel

**APPLICATION: Withholding of removal; Convention Against Torture**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WRITTEN DECISION AND ORDER

The respondent is a 35-year-old single male alien, a native and citizen of Jordan, who was admitted as a non-immigrant visitor in October 1989, and who overstayed his non-immigrant visa. The respondent was convicted on October 20, 1998, for conspiracy to defraud the United States, receiving a sentence to imprisonment for 20 months. Upon his release to Service custody, he was ordered removed from the United States to Jordan on May 10, 1999, under expedited removal proceedings by the Immigration and Naturalization Service.

However, the respondent was referred to an Asylum Officer after expressing a fear of persecution should he be returned to Jordan. On July 20, 1999, the Asylum Officer found that the respondent possessed a "reasonable fear of persecution" of returning to Jordan. His decision in this regard is attached to the record at exhibit 1, and the case was then referred by the Service to the court

1

to conduct a hearing on the merits of the respondent's claim of persecution. In this regard, the court may only consider the respondent's application for withholding of removal under section 241(b)(3)2 of the Immigration and Nationality Act, given the posture of these proceedings. See 8 C.F.R. § 208.31(g)(2)(i). Further, given the jurisdiction vested in the court by the Attorney General, the court may also consider this case under the provisions of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (hereinafter Torture Convention"). See 8 C.F.R. § 208. 16(a) et seq. On September 27, 1999, the respondent appeared in court with counsel of record and presented testimonial and documentary evidence in support of his professed fear of being persecuted and/or tortured should he be compelled to return to Jordan. The respondent will be granted withholding of removal to Jordan in accordance with section 241(b)(3) of the INA.

The respondent testified that he was born in Jordan to parents of the Shiite Muslim religion. At the time he departed Jordan in October 1989 his father held the rank of Colonel in the Jordanian army, and the respondent was a police officer. In this regard, the respondent received extensive training in anti-terrorism and was assigned to an elite police unit whose primary function was to protect foreign diplomats and their missions to Jordan, as well as investigating known or suspected terrorists targeting those diplomatic missions; the respondent's written application revealed that he held the rank of lieutenant of police.

The respondent continued with his testimony that he met and fell in love with a young woman of the same tribe as he, Omari, but of a different Muslim sect, the Sunni. Keeping with Islamic tradition, the respondent approached his girlfriend's parents requesting permission to marry their daughter. However, because of their differences of religion, and because the parents had arranged for their daughter to marry another man of more "substance," his request to marry was denied and he was forbidden to see their daughter again. According to the respondent, he intended to abide by their wishes since to do otherwise would mean breaking tribal custom. However, shortly before the wedding, she called the respondent, confessed her love for him, and begged him to save her from the arranged marriage.

The respondent described in some detail how the night before the wedding he, one brother, and some of the police officers the respondent commanded, entered the village where his girlfriend lived under the pretext of an investigation. The respondent and the girl had arranged for him to "rescue" her from her situation, and she was ready when he arrived. However, her younger brother saw the respondent and the other police and reported the "escape" to his parents, who in turn immediately contacted the respondent's family, complaining that their son had kidnaped their daughter on the eve of her marriage. In the meantime, the respondent took his girlfriend to a hotel where he spent the next two days with her; the respondent admitted having sexual relations with the woman, who was a virgin. He then left her at the hotel for safekeeping, intending to shortly return to her to run away and marry.

Upon his return home, the respondent was immediately arrested at the behest of the woman's family. According to the respondent's application, his father concurred with his son's arrest because he had shamed his family and had broken tribal custom. The respondent testified to being detained approximately 15 days while an investigation was made concerning his conduct as a police

2

investigator. Knowing full well the serious nature of the Islamic charges against him, his mother contacted a close friend who was a high ranking police official, who secured the release of the respondent from detention, further angering his girlfriend's family. For reasons unclear to the court, the criminal charges that were pending against the respondent for misconduct as a police officer were dismissed, apparently for lack of evidence. However, when it became clear that his father, in association with his girlfriend's family, intended to hand the respondent over to a special tribal committee to render Islamic law, he went into hiding. Again with his mother's aid, he secured a valid non-immigrant visa to the United States. Before he could leave, however, the respondent was spotted by members of the family's village, who gave chase and although the respondent eluded his would-be captors, they did manage to shoot him in the left thigh. The respondent sought immediate medical treatment at a hospital; he has submitted the medical records pertaining to his wound in this regard. The respondent thereafter departed Jordan quickly and arrived in the United States later in October 1989.

In the meantime, however, the respondent's brother, thinking he was helping to protect the respondent's prospective bride, divulged her whereabouts to the police, who went to the hotel and then turned her over to her family. The respondent related that shortly after his arrival in the United States, he read in a Jordanian newspaper that the woman, in accordance with Islamic or tribal law, was tortured and killed at the behest of her family in order to absolve the family of their shame and humiliation for the transgressions of their daughter.

The respondent conveyed to the court his fear of returning to Jordan, where he maintains he will be tortured and killed in accordance with tribal law. Even though the respondent concedes that Jordan has laws criminalizing the killing of men and woman pursuant to Islamic law who commit adultery, he is adamant that the government will not only not protect him from his murdered girlfriend's family, but will "acquiesce" in his torture and death by failing to enforce its penal laws against the Islamic-imposed death penalty. In this regard, the respondent posits that he is a member of a "particular social group" in accordance with section 101(a)(42)(A) of the INA, comprising those Jordanians who would face torture and death under Islamic law imposed by his tribe, which mandates the death of any man who has sexual relations with a virgin who is betrothed to another man. While acknowledging a double standard under Islamic law whereby the female is most-often put to death under such circumstances, the respondent points out that his murdered girlfriend's enraged family has demanded his death, too, and that he was shot by villagers sympathetic with his girlfriend's family in their attempt to bring him to face tribal justice as his girlfriend, who was tortured and killed. Consequently, the respondent argues that he, too, will suffer the same fate should he be returned.

Moreover, the respondent points out that his father is now a military general, and that his parents have divorced due to his mother's assistance to him (the respondent) and who herself fled to the United States. These occurrences to his father, the respondent explained, has caused him much shame and he will do nothing to intervene in his son's death under Islamic law imposed by his tribe. Finally, the respondent testified that he was informed by one of his co-defendants in his criminal trial who had returned to Jordan that his murdered girlfriend's family is aware that he is under immigration proceedings which could result in his forced return to Jordan, and that they are waiting for his return

3

in press forward with Islamic justice. Further, the respondent alleges that he would be unable to reside anywhere in Jordan. The respondent explained that he would be required to identify himself wherever he chose to live, and it would soon be known that he was a wanted man for violating Islamic law, who would be returned to the family's village to face his accusers.

To establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act, the applicant must establish a "clear probability" of persecution in returning to his native country, and must further demonstrate that the persecution would be "on account of" one of the statutorily-protected grounds set forth at section 101(a)(42)(A) of the Immigration and Nationality Act; i.e., race, religion, nationality, membership in a particular social group, or political opinion. Although an applicant need not show conclusively why persecution occurred in the past or may occur, Matter of S-P-, Interim Decision 3287 (BIA 1996), he must present some evidence of motive on the part of the persecutor, either direct or circumstantial, to establish eligibility for such protections. INS v. Elias-Zacarias, 502 U.S. 478 (1992). In this regard, the asylum applicant must produce sufficiently detailed evidence and testimony from which it is reasonable to believe that the harm he fears, or the harm already suffered, is encompassed within one of the statutorily-protected grounds as set forth above. If a reasonable person in the same or similar circumstances would fear persecution, the applicant may be seen to have presented sufficient evidence to be granted such relief, which is mandatory for withholding of removal under section 241(b)(3) of the Act. Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987).

The court has taken into consideration all of the testimonial and documentary evidence of record. In relation to the respondent's testimony, the court concurs with Service counsel that the respondent was a thoroughly credible witness, presenting testimony which was credible, persuasive, and specific throughout. Balasubramanrim v. INS, 143 F.3d 157 (3d Cir. 1998); see also Matter of Y-B-, Interim Decision 3337 (BIA 1998)("specific, detailed, and credible testimony or a combination of detailed and corroborative background evidence is necessary to prove a case for asylum.") However, as the Board has instructed, a finding of credible testimony by an asylum applicant is not necessarily dispositive as to whether asylum should be granted; rather, the specific content of the testimony, and other relevant evidence in the record, must also be considered. Matter of E-P-, Interim Decision 3311 (BIA 1997). The court has evaluated this claim in such context.

The respondent's claim is based solely on account of his membership in a particular social group which he specifically defines as consisting of Jordanians who have violated sacred tenets of Islamic law by having a sexual relationship with a virgin woman betrothed to another man, and who cannot avail himself of protections of the Jordanian government, which can not or will not enforce its laws to protect him. Generally speaking, the group is also defined by the respondent as that group of Jordanians subjected to harsh Islamic law for their transgressions, and that the government of Jordan can not or will not invoke its meager laws to protect them. For such violations, the respondent argues, the death penalty is mandated.

"Membership in a particular social group" is perhaps the most difficult of the protected grounds to establish refugee status pursuant to section 101(a)(42)(A) of the Act. This is due, in no small measure, to the fact that the other grounds are fairly straightforward in their meaning, although all

4

grounds have generated much litigation, both in the administrative and federal law contexts, over the years. But "social group membership" has generated, until recently, the least amount of litigation. In numerous contexts now it has risen to the fore and has forced this country to review its commitments to protecting the downtrodden against despotic governments, or groups which foreign governments can not or will not control. The Third Circuit Court of Appeals, in Fatin v. INS, 12 F.3d 1233 (3d Cir. 1993), under whose jurisdiction this court presides, recognized the historic struggles among both courts and commentators in defining just what it means to be a member in a "particular social group." After reviewing the meager legislative history of the term, the court essentially adopted the Board's definition of "particular social group" as set forth in Matter of Acosta, 19 I&N Dec. 211 (BIA 1985); see also Matter of H-, Interim Decision, 3276 (BIA 1996).

The Service's objection to the respondent's application is grounded upon the belief that the respondent's fears, while genuine, cannot be considered as a basis for his inclusion in the category "particular social group." Further, the Service maintains that the respondent is sought by his deceased girlfriend's family, who seek revenge against him for "tainting" their daughter. "Revenge," posits the Service, is not a valid basis upon which withholding of removal can be granted. Finally, the Service points out that Jordan has laws which criminalize the killing of men and women for the reasons upon which the respondent seeks to avoid his removal to Jordan, and thus he may appropriately seek his government's protection against the avenging family.

Counsel for the respondent counters that Jordanian society itself supports the imposition of Islamic justice outside of Jordanian law, and that such justice is tailored toward the actions of the individual rather than the gender of the violator. While conceding that more often than not the woman is blamed under Islamic law for losing her virginity to a man who is not her husband, and is subject to death much more often than man, counsel points towards documentary evidence in the record where both individuals are subject to the imposition of tribal customs and laws, albeit on an uneven scale. In any event, counters counsel, the respondent has already been referred to an Omari tribal court to receive Islamic justice, that he has been shot in an effort to bring him to justice, and that his girlfriend has been murdered by her own family under tribal/Islamic custom. Finally, counsel argues that Jordan has a pattern and practice of failing to enforce its criminal laws to prevent the imposition of the death penalty under Islamic law, and as importantly, fails to effectively punish those in violation of its criminal laws who kill in accordance with Islamic law.

First, it is without contention that a segment of the Jordanian Islamic population strictly adheres to the Islamic code of justice, a law which is outside the formal Jordanian penal code. Second, it is also quite obvious that while Jordanian criminal law does forbid the imposition of the death penalty rendered in accordance with Islamic tribal custom, the effectiveness of such national laws appears to be weak or nonexistent. The evidence before the court even points to the fact that Queen Nor, the wife of the late King Hussein, has actively supported more protections for Jordanian women who are singled out for punishment under Islamic law far more often, and with much more severe results, than Jordanian men, particularly in regards to the death penalty. The Queen also lends her support to the imposition of stronger penal laws against Jordanian men, who are likely to escape punishment under Jordanian law, or who receive very light sentences for carrying out Islamic justice

5

primarily against women.  Group exhibit 9-B.

Consequently, the question this court must decide is not whether this respondent stands the likelihood of being put to death by his deceased girlfriend's family.  In the terms of withholding of removal, there is a "clear probability" at the least of that result.  Given the credible testimony of the respondent, and as further corroborated by the documentary evidence of record, including his mother's written statement, this court is convinced that imminent death awaits the respondent under Islamic law should he be forcibly removed to Jordan..  Indeed to believe otherwise would necessitate a finding that only part of the respondent's testimony was credible, or that his likely death is speculative.  The court would add at this juncture, that given the circumstances of this case, particularly with regard to the respondent's father's high military rank, which actually works to the respondent's detriment, he would not be able to avail himself of any protection by the Jordanian government, national or local.

No, the question to be decided, and the ultimate issue to be resolved, is whether the harm to be inflicted on the respondent is "on account of" a statutorily-protected ground, in this case, "membership in a particular social group."  Given the likelihood of death should the respondent be forcibly removed to Jordan, the court has closely studied the precedent decisions of the Board and the Third Circuit dealing with persecution on account of "membership in a particular social group."  After such reflection, the court finds that the respondent has presented sufficient evidence to prove his membership in that class of aliens for which this particular ground of persecution would provide him the protection of the United States.  While the Service argues that the Board's recent decision in Matter of R-A-, Interim Decision 3403 (BIA 1999) controls so as to compel a denial of the case at bar, the court disagrees.  The court reads Matter of R-A- as a further refinement by the Board on how to determine whether an alien has properly described his or her membership in a "particular social group."  Since the Fatin court deferred to the Board's definition of what constitutes a "particular social group" in Matter of Acosta, supra, this court presumes that the further refinement by the Board of this ground of persecution would meet with equal acceptance by the Third Circuit.

In Matter of R-A-, the Board revisited the concept of "particular social group" as a basis for asylum.  There, a divided Board found that Guatemalan women who are forced to live under male domination and who are victims of domestic violence do not qualify for membership in a "particular social group" for asylum purposes. The Board explained, *inter alia*, that to validly constitute a "social group" under our asylum laws,

> "there must also be a showing of how the characteristic is understood
> in the alien's society, such that we in turn may understand that the potential
> persecutors in fact see persons sharing the characteristic as warranting sup-
> pression or the infliction of harm."

Id, at 11.  Thus, the Board found that the respondent had not shown that Guatemalan female victims of domestic violence were harmed "on account of" their identification as members of such a defined or cognizable group in Guatemala.

While the Board's majority apparently did not view the above-cited required showing as any additional requirement than earlier established under <u>Matter of Acosta</u>, <u>supra</u>, the Board's dissenting members viewed it differently: "The majority proposes a laundry list of hurdles to be cleared before she may demonstrate membership in a particular social group." Dissenting opinion at 22. Rather, the dissent would have found that the immutable characteristic of gender, coupled with egregious government acquiescence to domestic violence against women, constitute a permissibly-defined "particular social group" for asylum purposes. Thus, the Board now requires examination of the extent to which the society in the alien's native country recognizes a particular group's characteristics as a basis for directing punishment before membership within that group may be a legitimate basis for asylum in the United States. Applying the Board's decision in <u>Matter of R-A-</u>, <u>supra</u>, to the case at bar, the court concludes that the respondent would fit <u>squarely</u> within the parameters set by the Board for demonstrating the existence of a "particular social group" which Jordanian society recognizes and whose members are often targeted for death under the strictures of Islamic law as meted out by tribal authorities outside Jordanian national law.

As discussed, the Board requires a showing that the alien's society recognizes the characteristics of a social group and its membership in such manner that asylum fact-finders may understand who the persecutors may be and the reasons for singling out such persons within the identifiable group for harm. Given that the Board found such a showing elemental to establishing a "particular social group," it makes sense, then, that the Board would view the evidence from the perspective of the persecutor and his motivation for inflicting the harm. Indeed, the Supreme court has found as crucial the need to establish the persecutor's motivation for the infliction of harm on an individual. <u>INS v. Elias-Zacarias</u>, <u>supra</u>.

In the present case, it cannot be argued that the respondent has an identifiable immutable characteristic shared by the group. In this case, such group, this court finds, consists of Jordanians who are subjected to death by Islamic law and who cannot adequately avail themselves of Jordanian government protection. To put it gently, the respondent voluntarily became a class member in this case when he knowingly had a sexual encounter with his girlfriend who was engaged to marry another man, and who had been ordered by the woman's parents to stay away from their daughter. And such characteristic is certainly "immutable" in the sense that the respondent cannot alter what has caused him to be placed within that "particular social group," nor can he disassociate himself from the group. Fortunately for the respondent, lack of intelligence is not an overriding adverse factor to be considered in the alternative. The court still cannot fathom what the respondent was thinking when he stole away the Moslem bride-to-be of another man on the eve of their wedding, had sexual relations with her on her arranged wedding date, and thought he could somehow marry her and live without repercussions. In any event, this is what happened. And the repercussions, by all evidence of record, are severe.

In accordance with the Board's guidance as outlined in <u>Matter of R-A-</u>, <u>supra</u>, the court must address the question of how or in what manner the respondent's group characteristic is viewed by Jordanian society. Such review, the Board explains, is necessary to provide the fact-finder an understanding of the motivations of the persecutors. While the Board determined that Guatemalan society did not overtly recognize women exposed to domestic violence at the hands of dominating

males as a distinct group within its society, this court is satisfied that Jordanians who violate Islamic law are duly recognized and dealt with violently by a substantial part of Jordanian society. Some of the documentary evidence suggests that primarily the lower economic rung of society faithfully adhere to tenets of Islamic justice to deal with its offenders, but that is not outcome-determinative in this case. And there is no disagreement between the parties in this case that this respondent faces the likelihood of death upon his return. Moreover, Jordanian law itself recognizes, and offers punishment, for those individuals who mete out Islamic justice to offenders through tribal courts. Thus, the court disagrees with the Service that Matter of R-A-, supra, compels denial of this claim. Quite the opposite is clearly indicated where Jordanian national law implicitly recognizes that "social group" of individuals who are killed through the carrying out of tribal law outside of the Jordanian justice system. Such recognition, not only by the government, but by Jordanian society itself, assists in the court's understanding of the "particular social group" at issue in this case. Matter of R-A-, supra.

As noted, the respondent contends, and this court agrees, that he cannot seek adequate protection from the Jordanian government from suffering the same fate as his murdered girlfriend, nor can he safely relocate anywhere else in Jordan, for the reasons he cited. The fact of his father holding the rank of general in the Jordanian army, according to the respondent, is detrimental to his case because his father felt humiliated that his son would dishonor his family. The respondent's mother recognized the urgency of the situation and risked her own safety by assisting her son to escape Jordan after the respondent's father made no efforts to intervene with his transfer to a tribal court to stand trial for violating Islamic law. In the end, the respondent need only show a "clear probability" that he stands the likelihood of persecution by a group which his government can not or will not control, not that it is an absolute certainty. The evidence of record amply supports his fears in this regard.

Given that the court will grant this respondent withholding of removal under section 241(b)(3) of the Act, there is no need to consider his alternative application under the U.N. Torture Convention. However, had the court done so, it likely would have reached the conclusion that the respondent had sustained his burden of proof to establish a "clear probability" of torture through the "acquiescence" of a government official whose duty includes preventing or protecting the respondent from torture. But no formal ruling will be entered in that regard.

Accordingly, based on the foregoing, the following order will be entered.

ORDER: The respondent's order of removal by the district director is hereby withheld pursuant to section 241(b)(3) of the Immigration and Nationality Act.

W.A. Durling
Immigration Judge

October 8, 1999

-8-

  

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB # 1105-0065
Notice of Appeal to the Board of Immigra
Appeals of Decision of Immigration Judge

---

1. | List Name(s) and "A" Number(s) of all Applicant(s)/Respondent(s):

   OMARI, Maher

   A76 766 772

   **\*\*INS MERITS APPEAL\*\***

   WARNING TO ALL APPLICANT(S)/RESPONDENT(S): Names and "A"
   Numbers of everyone appealing the order must be written in Item #1

   For Official Use Only

2. Applicant/Respondent is currently  [X] DETAINED    [ ] NOT DETAINED.

3. Appeal from the Immigration Judge's decision dated October 8, 1999.

4. **State in detail the reason(s) for this appeal. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

   ! **WARNING:** The failure to specify the factual or legal basis for the appeal may lead to summary dismissal without further notice, unless you give specific details in a timely separate written brief or statement filed with the Board.

   **This is a merits appeal by the Immigration and Naturalization Service (the "Service").**

   The Service hereby appeals a decision of the Immigration Judge granting the respondent withholding of removal under the Immigration and Nationality Act. The respondent failed to establish that it was more likely than not that he would suffer persecution if returned to Jordan. The background evidence did not support his claim that he would be persecuted because of his sexual relationship with a woman to whom he was not married. He failed to show that he would face harm on account of a protected ground. See, e.g., Matter of R-A-, Interim Decision 3403 (BIA 1999). The harm the respondent fears is a matter of personal revenge. See, e.g., Matter of Maldonado-Cruz, 19 I&N Dec. 509, 512 (BIA 1988) Matter of Y-G-, 20 I&N Dec. 794, 799 (BIA 1994). The respondent did not prove he could not seek the protection of the Jordanian authorities. Additional grounds and issues for appeal may be raised in the Service's appeal brief

   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*FEE EXEMPT\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(Attach more sheets if necessary)

5.   I   [ ] do
         [X] do not          desire oral argument before the Board of Immigration Appeals.

6.   I   [X] will
         [ ] will not         file a separate written brief or statement in addition to the "Reasons(s) for
                             Appeal" written above or accompanying this form.

**! WARNING:** Your appeal may be summarily dismissed if you indicate in Item #6 that you will file
separate written brief or statement and, within the time set for filing, you fail to file the brief or statement
and do not reasonably explain such failure.

US Immigration and Naturalization Service

| **SIGN HERE** → | 7. X by _~signature~_ | October 1Y, 1999 |
|---|---|---|
| | Signature of Person Appealing | Date |
| | *(or attorney or representative)* | |

8.                                              9.

| Mailing Address of Applicant(s)/Respondent(s) |
|---|
| Maher Omari |
| (Name) |
| c/o INS, Snyder County Prison |
| (Street Address) |
| 600 Old Colony Road |
| (Apartment or Room Number) |
| Selingsgrove, PA 17870 |
| (City, State, Zip Code) |

| Mailing Address of Attorney or Representative |
|---|
| Susan Weber, Esquire |
| (Name) |
| 2555 Kingston Road |
| (Street Address) |
| Suite 260 |
| (Suite or Room Number) |
| York, PA 17402 |
| (City, State, Zip Code) |

**! WARNING:** An attorney or representative will not be recognized as counsel on appeal and wi
not receive documents or correspondence in connection with the appeal, unless he/she submits
completed Form EOIR-27.

## CERTIFICATE OF SERVICE
### (Must Be Completed)

10.

I   Jeffrey T. Bubier, Assistant District Counsel          mailed or delivered a copy of this notice of app
                    (Name)

on   October 1Y, 1999                        to   Susan Weber, Esquire
            (Date)                                        (Opposing Party)

at   2555 Kingston Road, Suite 260, York, PA 17402.
                    (Address of Opposing Party)

| **SIGN HERE** → | X _~signature~_ |
|---|---|
| | Signature of Person Appealing |
| | *(or attorney or representative)* |

*Ex (D)*

**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

File:    A76 766 772 - York

Date:    APR - 7 2000

In re:  MAHER <u>OMARI</u>

IN REMOVAL PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:  Susan M. Weber, Esquire

ON BEHALF OF SERVICE:    Jeffrey T. Bubier
                         Assistant District Counsel

CHARGE:

Notice:    Sec.  237(a)(2)(A)(iii), I&N Act [8 U.S.C. § 1227(a)(2)(A)(iii)] -
                 Convicted of aggravated felony

In a written decision dated October 8, 1999, an Immigration Judge found the respondent removable as charged, but granted his application for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. §1231(b)(3). The Immigration and Naturalization Service filed a timely appeal of the Immigration Judge's decision. The respondent filed an appellate brief in opposition. For the following reasons, the Service's appeal will be sustained, and the record will be remanded to the Immigration Court for further proceedings.

The respondent is a native and citizen of Jordan, who was admitted as a non-immigrant visitor in October 1989. The record reveals that the respondent was convicted on October 2, 1998, in the United States District Court for the Northern District of Illinois, for the offense of Conspiracy to Defraud the Government, in violation of 18 U.S.C.§ 371. The record further reveals that the respondent was sentenced to a term of incarceration for 20 months as a result of the conviction. We find no error in the Immigration Judge's determination that the respondent has been convicted of an "aggravated felony" as that term is defined in section 101(a)(43)(M) of the Act, 8 U.S.C. § 1101(a)(43)(M).

On May 10, 1999, the respondent was ordered removed from the United States to Jordan by the Service under expedited removal proceedings. However, on July 19, 1999, an asylum officer found that the respondent possessed a reasonable fear of persecution of returning to Jordan and the case was referred by the Service to the Immigration Court (Exh. 1).

A76 766 772

# I. Asylum and Withholding of Removal

We find no error in the Immigration Judge's determination that the respondent's conviction for an "aggravated felony" precludes him from applying for or being granted asylum under section 208(b)(2) of the Act, 8 U.S.C. § 1158(b)(2).

Initially, we note that during the deportation proceedings on August 4, 1999, the Service indicated that it would not take the position that the respondent had been convicted of a particularly serious crime (Tr. at 7). Therefore, the respondent remained eligible for withholding of removal and deportation pursuant to section 241(b)(3) of the Act, 8 U.S.C. § 1231(b)(3) (conviction for an "aggravated felony" and a term of imprisonment of 5 years or more, or conviction of a "particularly serious crime" bar an alien from seeking withholding of removal and deportation).

To establish eligibility for withholding of removal pursuant to section 241(b)(3) of the Act, 8 U.S.C. § 1231(b)(3)(B) (supp. II 1996), an alien must demonstrate that his life or freedom would be threatened in that country on account of race, religion, nationality, membership in a particular social group, or political opinion. Withholding of removal under the Torture Convention may only be granted where the respondent establishes that it is more likely than not that he would be tortured if removed to his home country. 8 C.F.R. § 208.16(c)(2)(1999).

We have reviewed the record of proceeding, including the appellate briefs submitted by the respondent and the Service. The parties are fully conversant with the facts of the case, which are well-summarized in the Immigration Judge's written decision and need not be repeated in this decision. Initially, the Board concludes that the respondent provided credible testimony at his deportation hearing. *See generally Matter of A-S-*, 21 I&N Dec. 1106 (BIA 1998) (discussing credibility-related issues).

The respondent claims that he is a member of a particular social group in accordance with section 101(a)(42)(A) of the Act, consisting of those Jordanians who would face torture and death under Islamic law imposed by his tribe, which mandates the death of any man who has sexual relations with a virgin who is engaged to another man. The respondent testified that he fears returning to Jordan because he believes he will be tortured and killed in accordance with tribal law for having had sexual relations with his girlfriend, a woman from another tribe that was engaged to another man. He asserts that although Jordan has laws criminalizing the killing of men and women pursuant to Islamic law who commit adultery, the government will not protect him from his murdered girlfriend's family, but will "acquiesce" in his torture and death by failing to enforce its penal laws. The respondent testified that he was shot in the leg before he left Jordan by villagers sympathetic to his girlfriend's family, and that they will attempt to find him again should he return to Jordan. The respondent also testified that his father is now a general in the Jordanian army, and that he will do nothing to prevent the respondent's murder, due to the shame the respondent has brought upon the family.

The Immigration Judge found that the respondent established that he is a member of a particular social group, in accordance with *Matter of R-A-*, Interim Decision 3403 (BIA 1999). He further found that the respondent established a clear probability that he stands the likelihood of persecution by a group which his government cannot or will not control. Specifically, the Immigration Judge

2

A76 766 772

found that the respondent was a member of a group consisting of Jordanians who are subject to death by Islamic law and who cannot adequately avail themselves of government protection (I.J. at 7). He determined that the respondent voluntarily became a class member when he knowingly had a sexual encounter with his girlfriend, who was engaged to marry another man, and that Jordanians who violate Islamic law are duly recognized and dealt with violently by a substantial part of Jordanian society (I.J. at 8).

On appeal the Service contends that the respondent did not establish that he is a member of a cognizable social group in accordance with Board of Immigration Appeals precedent, and he did not prove that there was a clear probability that his life or freedom would be threatened on account of a protected ground. In opposition to the Service's appeal, the respondent argues that the Immigration Judge correctly granted the respondent withholding of removal under the Act.

Based upon our review of the record, we find no error in the Immigration Judge's recitation of the factual record, but we do find that the group identified by the Immigration Judge has not adequately been shown to be a "particular social group" for withholding purposes. We have previously found that members of a particular social group share a "common, immutable characteristic" that they either cannot change, or should not be required to change because such characteristic is fundamental to their individual identities. *See Matter of R-A-*, Interim Decision 3403 (BIA 1999); *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *Matter of H-*, 21 I&N Dec. 337 (BIA 1996); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). We have recognized that persecution can consist of the infliction of harm or suffering by a government, or persons a government is unwilling or unable to control. *See Matter of Acosta, supra.*

The United States Court of Appeals for the Third Circuit, the circuit in which this case arises, adopted the Board's definition of "particular social group" as set forth in *Matter of Acosta, supra,* at 233. *Matter of Fatin,* 12 F.3d 1233, 1239-40 (3d Cir. 1993). The Board interpreted the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. *Matter of Acosta, supra,* at 233. The Board explained further:

> The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. . . . However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.*

The Third Circuit also determined that an alien must establish the following elements in order to qualify for withholding of deportation or asylum based on membership in such a group: The alien must (1) identify a group that constitutes a "particular social group" within the interpretation just discussed, (2) establish that he is a member of that group, and (3) show that he would be persecuted

3

or has a well-founded fear of persecution based on that membership. *Matter of Fatin, supra*, at 1240. Initially, we find that "Jordanian men who have had sexual relations with a virgin engaged to another man" is not a particular social group. We find that the Immigration Judge did not sufficiently consider the question of whether anyone in Jordan perceives this group to exist in any form whatsoever. *See Matter of R-A-, supra*, at 14. For the group to be viable for asylum purposes, there must also be some showing of how the characteristic is understood in the alien's society, such that we can understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm. *Id.* at 14-15. Although the respondent fits within the proposed group, he has not shown that this group is recognized and understood to be a societal faction, or is otherwise a recognized segment of the population, within Jordan. *Id.* at 15. Furthermore, the respondent has not shown that the characteristic of being a Jordanian male that has had sexual relations with a virgin who is engaged to another man is one that is important within Jordanian society.

The documentary evidence contained in the record, including the State Department's *Country Reports on Human Rights Practices for 1998* for Jordan and other background articles submitted by the respondent, discusses in great detail the societal repercussions against *women* who are virgins and engage in sexual relations outside of marriage (Exh. 8). One of the background documents submitted explains that virginity among women is highly honored in the Middle East, which has led to the practice of honor killing. This occurs when a male relative decides to kill a female relative because in his view she has tarnished the honor and the image of the family by losing her virginity prior to marriage. All of the articles submitted attest to the murder of women for alleged sexual impropriety. None of the articles discuss the murder of men that have engaged in sexual impropriety. In fact, one article notes that "[m]ale relatives rarely attack men suspected of infidelity, partly because this would spark a blood feud with the man's kinsmen and partly because of double standards" (Exh. 8). The only evidence pertaining to men who may be victimized is contained in Article 340 of the Jordan Penal Code, which states: "[h]e who discovers his wife or a female relative committing adultery and kills, wounds or injures one or both of them is exempted from any penalty" (Exh. 8). Yet no evidence has been submitted which supports the assertion that men such as the respondent are a recognized segment of the population in Jordan, or that they suffer harm based on their membership in this particular social group. Indeed, there is no evidence that the alleged persecutor, the girlfriend's family, was even aware of the group's existence. Thus it becomes harder to understand how the alleged persecutor may have been motivated by the respondent's "membership" in the group to inflict harm on him. Rather, it appears that the respondent's girlfriend's family sought to harm the respondent purely as a matter of personal revenge, and not based on his membership in a particular social group.

Based on the record, we find that the respondent has not adequately established that we should recognize the particular social group identified by the Immigration Judge. We also do not agree with the Immigration Judge's nexus analysis. The respondent has not established that his persecutor has targeted and harmed the respondent because he perceived him to be a member of this particular social group. The respondent fails to show how other members of the group may be at risk of harm from his persecutor. If group membership were the motivation behind the respondent's potential harm from his persecutor, one would expect to see some evidence of it manifested in actions toward other members of the same group. *See Matter of R-A-, supra*, at 17; *see, e.g., Li v. INS*, 92 F.3d 985 (9th Cir. 1996) (holding that even if Chinese citizens of low economic status did constitute a

4

particular social group, the petitioner did not establish that authorities targeted members of that group); *Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir. 1986) (finding that even if young, working class, urban males in El Salvador were a particular social group, the alien failed to demonstrate that the government singled out members of this group). The respondent indicates that he fears violence from his former girlfriend's family. The record does not reflect that her family seeks to harm any other men who have engaged in similar behavior. The evidence indicates that the focus of the girlfriend's family was on the respondent because of his illicit relationship with his girlfriend, not because he was a member of some broader collection of men, however defined, whom they believed warranted the infliction of harm. *See Matter of R-A-, supra*, at 18. We also do not believe that the absence of an effective governmental reaction to honor killings under the color of Islamic justice translates into a finding that the respondent's girlfriend's family seeks to harm him because he is a member of a particular social group. Indeed, we have determined that "construing private acts of violence to be qualifying governmental persecution, by virtue of the inadequacy of protection, would obviate, perhaps entirely, the 'on account of' requirement in the statute." *Id.* at 20. When action is directed toward but one individual, or toward a small number of close family members, it calls into question both the propriety of the group definition and the alleged group motivation of the persecutor. *Id.* at 22; *see also Matter of Kasinga, supra*. We find that the respondent has failed to show a sufficient nexus between his girlfriend's family's desire to harm him and the particular social group the Immigration Judge has set forth. We find that the respondent failed to demonstrate that a clear probability exists that he would be persecuted on account of his membership in a particular social group if he returns to Jordan. We therefore do not find the respondent eligible for withholding of removal under section 241(b)(3) of the Act.

## II. Torture Convention

The respondent also contended that his removal to Jordan would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) ("Convention Against Torture").

The term "torture" is defined as:

> . . . any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*See* 64 Fed. Reg. at 8490 (to be codified at 8 C.F.R. § 208.18(a)). We note that in his decision the Immigration Judge stated since he had granted the respondent withholding of removal under section 241(b)(3), there was no need to consider his alternative application under the United Nations Convention Against Torture. Although the Immigration Judge indicated that he "likely would have reached" the conclusion that the respondent had sustained his burden of proof, he did not enter a

A 76 766 772

formal ruling regarding that issue.   The Immigration Judge did not formally consider the respondent's application under the Torture Convention, and the parties have not had the opportunity to fully present their arguments on this issue.   Accordingly, we find it appropriate to remand this matter to determine whether the respondent is currently eligible for any other form of relief from removal.

ORDER:   The Service's appeal is sustained, and the Immigration Judge's decision is vacated.

FURTHER ORDER:   The record is remanded to the Immigration Court for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

FOR THE BOARD

$\mathcal{E}x \; \underline{E}$

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## UNITED STATES IMMIGRATION COURT
## YORK, PENNSYLVANIA 17402

| | |
|---|---|
| **IN THE MATTER OF** | **IN SECTION 238(b)REMOVAL PROCEEDINGS** |
| OMARI, Maher (RESPONDENT) | **CASE# A 76 766 772** |

**GROUNDS OF REMOVAL**: 237(a)(2)(A)(iii): Aggravated felon

| | |
|---|---|
| **ON BEHALF OF RESPONDENT** | **ON BEHALF OF INS** |
| Pro se | Maureen Gaffney Assistant District Counsel |

## ON REMAND FROM THE BOARD OF IMMIGRATION APPEALS

**APPLICATION:** Claim under Convention Against Torture

### WRITTEN DECISION AND ORDER

On April 7, 2000, the Board of Immigration Appeals remanded the record to this court to permit the respondent to pursue an application under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment. In its decision the Board reversed this court's grant of withholding of removal under section 241(b)(3) of the Act. On May 19, 2000, the court heard further testimony from the respondent as well as telephonic testimony from the respondent's mother, augmenting the two letters she had submitted, one prior to the last hearing in this case, and one in support of her son's Article 3 claim. Based on further consideration of the evidence of record, the court finds more than ample evidence that the respondent stands a clear likelihood of being tortured upon his return to Jordan. Consequently the respondent will be granted withholding of removal pursuant to section 241(b)(3) of the Act under the auspices of Article 3 of the Torture Convention.

The evidence which has already been introduced in this case at the prior hearing remains a part of this record, in addition to the additional evidence submitted by the respondent. The

respondent's mother testified [1] that she departed Jordan in 1992 and has remarried in the United States. When questioned about the reasons for her divorce from her former husband, the respondent's father, she testified that she disagreed with her former husband's abandonment of their son, the respondent, after he had embarrassed and dishonored the family by having a sexual relationship with a betrothed woman in Jordan. The witness related that through the assistance of a friend in the military whom she kept confidential, she helped her son to escape the military prison where he was being kept. Following his release but before he could leave Jordan, the respondent was shot in the leg by persons from the betrothed woman's tribe; the witness also confirmed that the woman was murdered by her family under tribal law due to her infidelity.

The witness went on to testify that her former husband, then a Colonel in the Army and now a General, did not find out about her helping her son escape from jail and leave Jordan until both of them had already departed the country. When questioned why the military authorities would have turned the respondent over to the tribal authorities to extract their revenge,[2] the witness explained that the tribal group is one of the largest in Jordan, and they demanded the right to punish the respondent, and the respondent's father, General Omari, had intended to ensure that his son was in fact turned over to the tribal authorities for this purpose. The witness further explained that the General considers the respondent's conduct as betraying and dishonoring the family, and that the only way to have honor restored to the family name is to turn his son over to tribal authorities to carry out its honor killing. The witness also related that friends in the United States have informed her that their friends in Jordan are aware that the tribal authorities and General Omari somehow know that the respondent is in removal proceedings and word has spread to be on the lookout for his return.

Finally, while the witness acknowledged that Jordanian national law forbids honor or revenge killings, the witness contends that it is often ignored where tribal custom and law are of primary importance when a family's honor was impugned or castigated. The witness contends that her former husband is still in a position to exercise his authority to ensure that the respondent meets with tribal justice when he is returned, no matter how long that would take. Further, the witness pointed out that the tribal group involved is the Omari tribe, of which the respondent's father is related by blood; that the incident was in the newspaper at the time it occurred; and that all of her children have departed Jordan, living in the United Arab Emirates and Yemen.

The respondent also provided further brief testimony. The respondent explained that the Omari tribe is one of the more important and historical tribes in Jordan, and the surname "Omari" denotes a well known family. The respondent testified that his father had been singled out by King Hussein for lifetime tenure in the army when he had been the first officer on the scene of the helicopter crash that claimed the life of the King's first wife, and the King was thereafter

---

[1] The respondent's mother's testimony was highly emotional for her and was interrupted continuously by her crying. However, the interpreter was able to successfully elicit all of her responses to questions asked by the court and by Service counsel.

[2] The respondent had earlier testified that he was a police officer and had been arrested by his superiors and placed in a military jail.

appreciative of the respondent's father's gestures at the time. While acknowledging that women are more often targeted for harsher treatment for infidelity than men, the respondent explained that when the man is positively identified he, too, is subjected to revenge killing. Moreover, given that his father remains influential in Jordan, is of the same tribal group which has sought him to enforce for tribal justice against him, and who believes that the honor of the family name is at stake, his killing at the hands of the tribal authorities is preordained if he is returned to Jordan.

Under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, the United States has agreed not to "expel, return extradite" a person to another state where he or she would be tortured:

1. No State party shall expel, return (refouler) or extradite a person to another State where there are substantial grounds for believing that he or she would be in danger of being subjected to torture.

2. For the purposes of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant, or mass violations of human rights.

While there are similarities between Article 3 of the Torture Convention and Article 33 of the 1951 Convention Relating to the Status of Refugees, which the United States has implemented through application of withholding of removal pursuant to section 241(b)(3) of the Immigration and Nationality Act, there are also important differences between the two.

First, there are no exceptions carved out under the Torture Convention to exclude persons who may or must be exempted under Article 33, such as persecutors, those convicted of particularly serious non-political crimes, or terrorists. Second, section 241(b)(3) applies only to those aliens who would face persecution on account of the five grounds set forth at section 101(a)(42)(A) of the INA. Article 3 of the Torture Convention covers all persons who fear torture based on any consideration or basis. Third, torture is not synonymous with "persecution," although there may be an overlapping of violence which may encompass both actions. Thus, a claim under Article 3 of the Torture Convention is broader in certain aspects, narrower in others, in relation to Article 33 of the 1951 U.N. Convention.

Aliens under removal proceedings under section 240, or under deportation or exclusion proceedings, may make a claim under Article 3, along with any other application, before an immigration court. The Attorney General of the United States has promulgated interim regulations which the courts must apply when adjudicating claims under the Torture Convention. These regulations are presently set forth at 8 C.F.R. §208.16 *et seq.*, entitled <u>Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture</u>. For all practical purposes, an alien making an application for asylum, also considered a tandem application for withholding of removal, should automatically be considered as making an application for relief under the Torture Convention. The regulations provide for the adjudication of such claims, and the framework for such adjudication. The burden of proof is on the alien to establish that "it

is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(c)(2).

In assessing whether it is "more likely than not" that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant:

(ii) Evidence that the applicant could relocate to a part of the country
   of removal where he is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within
   the country of removal, where applicable; and:

(iv) Other relevant information regarding conditions in the country of removal. .

8 C.F.R. § 208.16(c)(3).

If an alien expresses a fear of persecution in returning to his or her country of nativity, but if asylum must be pretermitted due to an aggravated felony conviction, or the other bars set forth under section 208(b)(2) of the Act, the judge must first hear testimony on the merits of the claim of persecution and/or torture before determining whether the aggravated felony conviction is a "particularly serious crime." 8 C.F.R. 208.16 (c)(4). If the judge determines that the alien has satisfied his or her burden of proof of establishing more likely than not that torture will occur in the country of removal, the judge must grant the alien withholding of removal under section 241(b)(3) of the Act under the auspices of Article 3 of the Torture Convention, unless the alien is barred from such relief in accordance with section 241(b)(3)(B) of the Act, in which case the judge must pretermit withholding of removal. At that point the regulations require the judge to defer the alien's removal in accordance with 8 C.F.R. § 208.17(a).

Further, the regulations provide a definition of "torture" at 8 C.F.R. § 208.18(a), which essentially tracks the definition of the term as set forth under Article 1 of the Torture Convention. It must be stressed that the definition of "torture" is not all encompassing, and it is not to be construed as a definitive list or types of acts which would constitute torture. Rather, the regulations set forth the general parameters under which the judge adjudicates the claim, expressing certain basic elements which must be present before a finding can be made that an act will constitute torture.

"Torture" is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. 8 C.F.R. § 208.18(a)(1).

"Torture" is an extreme form of cruel and inhuman treatment and does not include lesser

forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture. 8 C.F.R. § 208.18(a)(2). Torture does not include pain or suffering arising only from, inherent in, or incidental to lawful sanctions. 8 C.F.R. 208.18(a)(3). Lawful sanctions include judicially imposed sanctions and other law enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture.

Furthermore, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering: an act that results in unanticipated or unintended severity of pain or suffering is not torture. 8 C.F.R. § 208.18(a)(5). Finally, in order to constitute torture, an act must be directed against a person in the offender's custody or physical control. 8 C.F.R. § 208.18(a)(6). Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity. 8 C.F.R. § 208.18(a)(7). Noncompliance with applicable legal procedural standards does not per se constitute torture. 8 C.F.R. § 208.18(a)(8).

In a recent published decision, the Board instructed on the proper analytical framework when deciding whether an alien has met his burden under Article 3. In Matter of S-V-, Interim Decision 3430 (BIA 2000), the Board focused on two of the essential requirements for prevailing on an Article 3 claim: (1) that a "public official" or other "person acting in an official capacity" participate in or acquiesce in the torture, and (2) the specific activity constituting torture. This court finds the points raised by the Board as to these two aspects of the regulations to be clearly found in this case.

Not disregarded is the Board's ruling below, which pointed out what it determined to be a lack of documentary evidence to support the respondent's claim of being killed upon his return to Jordan as an act of honor or revenge due to his sexual relationship with a woman. However, the primary thrust of the Board's decision was its disagreement with this court's finding that the respondent was a member of a "particular social group;" it thus reversed this court's grant of withholding of removal. Notwithstanding, this court finds ample and unrefuted evidence in this record that the respondent will in fact be put to death upon his return to Jordan as he and his mother testified, and under the facts of this case, such death fulfills the definition of torture under Article 3 mandating that his removal from the United States be withheld.

First, Service counsel did not challenge the credibility of either the respondent or his mother, although she points out that the mother may be biased. Perhaps, but such relationship to the respondent does not per se mean that her testimony is untruthful. In fact, she testified that she has heard from friends that an active lookout for the respondent has been made known in Jordan. The witness also testified that her former husband, now an army General, will certainly use his influence to ensure that the respondent is turned over to the tribal authorities to carry out their honor killing (sharaf), and that such death is the only way her former husband believes that his family name will be restored, which the respondent sullied by his conduct. Further, this witness testified about the efforts she made to secure the release of the respondent from jail in 1989 when she discovered that her husband intended to turn their son over to tribal authorities. Thus, a clearly detailed and persuasive context was provided by the witness supporting her testimony and beliefs on the certain death of her son should he be returned to Jordan.

The respondent also testified to essentially the same facts and circumstances of his reasons for quickly departing Jordan, both at his earlier hearing and in conjunction with his claim under Article 3. And while the Board in its review of the earlier case found sufficient corroborating documentary evidence lacking, it did not find the respondent to have testified incredibly. This court makes a finding, after close observation of the witness under oath, that his testimony, both at his last hearing and again on the hearing in this matter, was wholly consistent, detailed, and plausible, providing a coherent account for his belief that he will be subjected to torture upon his return to Jordan. <u>Balasubraminrum v. INS</u>, 143 F.3d 157(3rd Cir. 1998); the same finding is made, as noted, concerning the respondent's mother's testimony.

At this juncture the court will note that the Board, analyzing part of the documentary evidence in the record, observed that exhibit 8 stated that "male relatives rarely attack men suspected of infidelity, partly because this would spark a blood feud with the man's kinsmen and partly because of double standards." The Board cited this piece of evidence to substantiate its basis for finding the documentary evidence not fully supportive of the respondent's testimony. But what is crucial to the issue at hand is that the respondent once again identified the tribal group he fears as the Omari group, of which his father is directly related by blood. This latter additional testimony may not have been made during his initial testimony, although the court seems to recall that the respondent did in fact state the name of the tribal group as the Omari. In any event, this further testimony of the respondent, relatively innocuous at first, sheds more light on his likelihood of being turned over to the tribal authorities. That is, the respondent's father, and thus presumably the respondent, is related by blood to the members of that group. Thus, there can be no basis for a reluctance at sparking or risking a blood feud since all of the major actors in this case are related through blood, and may perhaps further explain why the respondent's father is eager to subject his son to tribal justice.

As important, what cannot be overlooked in this case is the role that the respondent's father played, and according to the respondent, continues to play. At the time of the respondent's departure from Jordan in 1989, his father was an army Colonel; he is now a General. This man made it clear from the beginning that the respondent had betrayed and dishonored his family and that tribal law required that he be turned over to tribal authorities to face justice; only in this way would the Omari family's honor be restored. Indeed, the woman over whom this whole affair occurred was killed by her relatives, and it was made clear to the respondent that he, too, would be taken from his military cell and relinquished to the tribal authorities to carry out their brand of justice. As point of fact, after his mother was able to secure his release from jail, and before he could leave Jordan, he was spotted by members of the woman's family and shot and wounded, although he was able to make his escape and seek immediate treatment at a hospital. Any clearer intention on the part of the tribal authorities whom the respondent fears in this case can hardly be made.

Certainly, as the Board noted, the documentary evidence of record shows a gender-biased culture in Jordan where the woman is much more often targeted for harsh penalties for adultery, including death, than the man. But the documentary evidence does not show that only women face harsh tribal justice in Jordan, and any attempt by this court to make such a finding of fact would be without foundation, particularly in light of the credible and unrefuted testimony of the respondent and his mother. Thus, even if this record was completely devoid of corroborating evidence to show that men in Jordan may be subjected to tribal law due to transgressions against family honor, the

respondent's testimony, as well as that of his mother, was unrefuted that his father, an army General, will take active measures to ensure the respondent is brought before the tribal authorities in order to restore honor to the family name. The regulations at 8 C.F.R. § 208.16(c)(2) permits the credible testimony of an alien to suffice to establish a likelihood of future torture under Article 3.

Applying the regulations to these facts, as well as the Board's decision in Matter of S-V-, *supra*, the first question to answer is whether there is evidence in the record that a government official or other person acting in an official capacity has ties to the future torture of the respondent. In this regard, the evidence establishes the direct involvement of the respondent's father, a General in the Jordanian military, who desires that his son submit to tribal justice for the dishonor brought on his family. The court finds that a General officer in the Jordanian military meets the definition of either "public official" or "person acting in an official capacity" in accordance with 8 C.F.R. § 208.18(a)(1). In this latter regard, the testimony of the witness and that of the respondent revealed that the General would use his position of authority once the respondent is returned to Jordan to ensure that he is brought before the tribal authorities in order for them to inflict death pursuant to tribal justice. Whether viewed as a "public official" or "person acting in an official capacity," the respondent's father meets both criteria: the former by virtue of his high military rank and office, the latter based on the willingness of the General to use his rank to ensure that the respondent faces tribal justice contrary to Jordanian national law.

Can the respondent rely on the Jordanian government to protect him? Clearly not. The respondent's father, as a General officer, obviously would have great inherent powers of authority in his own right, which is made more so by the fact of his lifetime tenure bestowed upon him by the now-deceased King Hussein, and who, according to the respondent, is held in high esteem in his country . As the respondent and his mother repeatedly testified, his father had every intention of turning him over to tribal authorities when the respondent was jailed before his escape from Jordan, and the evidence of record shows that the General has every intention of carrying out that deed upon the respondent's return. Moreover, the documentary evidence of record reveals that while revenge or honor killing is against Jordanian national law,[3] it nonetheless exists to a high degree in Jordan. In fact, former Queen Noor made public attempts to eliminate or at least reduce the harsh consequences of tribal justice, unsuccessfully. Further, the respondent's mother testified that she has it on good authority that the respondent's removal is being anticipated in Jordan, that he will be turned over to the tribal authorities upon his return, and that the Jordanian government will not protect him under its laws to prevent his murder, given the high degree of respect for the respondent's father.

Does the respondent's father need to actually participate in the respondent's torture? No. The federal implementing regulations, as the Board explained, only require that the official have awareness that torture will take place and thereafter breach his responsibility to intervene to prevent or stop such activity. 8 C.F.R. § 208.17(a)(7); Matter of S-V-, *supra*, at 6. Not only will General Omari not undertake any efforts to stop the torture of the respondent, but will actively participate, if necessary, to ensure that the respondent will be turned over to tribal authorities in this regard.

---

[3]Actually, Jordanian national law permits a judge to impose a very lenient sentence on men who stand convicted of murdering a female relative to avenge family honor.

Does the General have the duty to intervene or not to acquiesce in the respondent's torture? Yes. By any measure, the General's acts of commission (by undertaking to ensure the respondent is relinquished to tribal authorities, or omission (by failing to stop or prevent the respondent's torture/death at the hands of an unauthorized tribal tribunal) clearly fall within those actions or inactions proscribed by the regulations implementing the Torture Convention.

Moreover, it cannot be seriously doubted that the respondent's death would constitute "torture" as that term is defined in the federal regulations, although the court is not aware of any precedent stating so. However, this court cannot fathom how actually being put to death outside of a country's established criminal justice system where there are absolutely no safeguards of any internationally recognized standards of due process cannot be considered the ultimate act, or at least the culminating act, of torture.

Another issue raised in this case is the official character of the tribal authorities who will sentence the respondent and who will carry out the sentence. The Board found in S-V- that the alien had not shown that the Colombian government condoned or acquiesced in the guerrilla's activities of harming its citizens, particularly where the evidence showed the government in active combat with the guerrillas. However, in this case, Jordan has a history, up to this day, of failing to apply its laws to prevent a great many revenge or honor killings by tribal authorities, *albeit* more often against women than men. Nonetheless, this court will not engage in an analysis which recognizes only the most prevalent victims of tribal justice, women, and thereby wholly discounting the fact that men, even to a lesser degree, face the same justice. The court sees no valid reason to "participate" in Jordan's double standards of harsh Islamic justice when applying Article 3 to an intended male victim. That is, the evidence in this record fully corroborates the respondent's testimony, as well as that of his mother, that the Jordanian officials will not intervene in this case to protect him, notwithstanding the fact that he is not of the female gender. Consequently, this court finds that the tribal authorities have implicit Jordanian government authority to carry out its sentence of death against the respondent without interference, and that such knowing indifference by the government of Jordan constitutes a clear case of "acquiescence" of the respondent's torture.

Moreover, there is a rational argument to be made that so pervasive and culturally-based is the carrying out of tribal justice in Jordan, so prevalent as to be denounced by Queen Noor, that such forums can be recognized for what they are: government sponsored extra-judicial forums of harsh punishment. Moreover, such "acquiescence" in this case is tantamount to Jordanian government complicity in the respondent's torture. However, the court is not suggesting that the respondent need show this *de facto* Jordanian government activity in order to carry his burden of proof, only that the evidence of record points to two parallel systems of justice in Jordan, notwithstanding Jordanian national law which prohibits revenge or honor killings.

Based on the foregoing, the court finds that the respondent has sustained his burden of proof of establishing that it is more likely than not that he would be tortured upon his return to Jordan, in accordance with the federal regulations implementing Article 3. Pursuant to 8 C.F.R. § 208.16(c)(4), the respondent will be granted withholding of removal under Article 3 of the Convention Against Torture.

ORDER: The respondent is hereby ordered removed from the United States to Jordan pursuant to the charge of removability set forth in his Notice to Appear.

FURTHER ORDER: The respondent's removal is hereby withheld  under Article 3 of the Convention Against Torture.

Walt Durling
Immigration Judge

May 24, 2000

Ex G



U.S. Department of Justice

*United States Attorney*
*Northern District of Illinois*

---

*Vilija A. Bilaisis*
*Assistant United States Attorney*

*Dirksen Federal Building*
*219 South Dearborn Street, Room 500*
*Chicago, Illinois 60604*

*Direct Line: (312) 353-3148*

August 23, 1999

The Honorable Walter Durling
Executive Office of Immigration Review
Immigration Court
York, Pennsylvania 17402

          Re:  Maher Omari
               A76-766-772

Dear Judge Durling:

     I am writing at the request of Maher Omari, whose immigration
case is currently pending before you.   I was the prosecuting
attorney in the criminal case entitled <u>United States v. Ali Iysheh
et al.</u>, 97 CR 460, brought in the Northern District of Illinois, in
which Mr. Omari was charged in all counts of a ten-count indictment
with conspiracy to commit bank fraud, transport stolen motor
vehicles interstate, and receive, possess, conceal, store, and sell
stolen motor vehicles, as well as with bank fraud, wire fraud,
interstate transportation of stolen motor vehicles, and receipt,
concealment, possession, and storage of stolen motor vehicles, in
violation of Title 18, United States Code, Sections 371, 1344,
1343, 2312, and 2313.  Mr. Omari pleaded guilty to the conspiracy
count, and agreed to cooperate against his co-defendants.  To that
end he was extensively debriefed by FBI agents and myself.
Paragraph 5 of his plea agreement, which I will send under separate
cover, reflects these debriefings.  Mr. Omari was never called upon
to testify, as his only remaining co-defendant before the Court
agreed to plead guilty, due at least in part to Mr. Omari's
willingness to testify against him.

     Pursuant to the plea agreement, at Maher Omari's sentencing
the government moved the Court to depart from the sentencing
guidelines range and to impose an agreed sentence of two-thirds of
the low end of the sentencing guidelines range.  The government
also moved to dismiss the remaining counts of the indictment.  The
Court granted the government's motions.

     The last defendant in case 97 CR 460, Yousef Apuzaitoun,

remains a fugitive.  Mr. Omari has expressed his willin[g]
continue to cooperate and to testify against Mr. Apuzaitou[ni]
when he is apprehended.

Very truly yours,

SCOTT R. LASSAR
United States Attorney

By:  VILIJA A. BILAISIS
     Assistant United States Att[orney]

cc:  Maureen Gaffney, INS Trial Attorney
     Paul Wagner, Attorney for Maher Omari

EX F

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB # 1105-0065

**Notice of Appeal to the Board of Immigr**
**Appeals of Decision of Immigration Jud**

| | | |
|---|---|---|
| **1.** | List Name(s) and "A" Number(s) of all Applicant(s)/Respondent(s):<br><br>OMARI, Maher<br><br>A76 766 772<br><br>**INS MERITS APPEAL**<br>WARNING TO ALL APPLICANT(S)/RESPONDENT(S): Names and "A" Numbers of everyone appealing the order must be written in Item #1. | **For Official Use Only** |

**2.**   Applicant/Respondent is currently   [X]  DETAINED   [ ]  NOT DETAINED.

**3.**   Appeal from the Immigration Judge's decision dated   May 24, 2000.

**4.**   State in detail the reason(s) for this appeal. You are not limited to the space provided below use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.

! **WARNING:** The failure to specify the factual or legal basis for the appeal may lead summary dismissal without further notice, unless you give specific details in a time separate written brief or statement filed with the Board.

**This is a merits appeal by the Immigration and Naturalization Service (the "Service").**

The Service hereby appeals a decision of the Immigration Judge granting the respondent withhold of removal under the United Nations Convention Against Torture and Other Forms of Cruel, Inhum or Degrading Treatment or Punishment. The respondent failed to establish that it was more likely t not that he would be tortured if returned to Jordan. Additional grounds and issues for appeal may raised in the Service's appeal brief

*********************************FEE EXEMPT*********************************

(Attach more sheets if necessary)

5.  I  ☐ do

       ☒ do not      desire oral argument before the Board of Immigration Appeals.

6.  I  ☒ will

       ☐ will not     file a separate written brief or statement in addition to the "Reasons(s) for Appeal" written above or accompanying this form.

> **WARNING:** Your appeal may be summarily dismissed if you indicate in Item #6 that you will file a separate written brief or statement and, within the time set for filing, you fail to file the brief or statement and do not reasonably explain such failure.

US Immigration and Naturalization Service

SIGN HERE  →  7.  X  by _____     June _ , 2000

_____     _____
Signature of Person Appealing     Date
*(or attorney or representative)*

8.                                         9.

| Mailing Address of Applicant(s)/Respondent(s) |
|---|
| Maher Omari |
| (Name) |
| c/o INS, Snyder County Prison |
| (Street Address) |
| 600 Old Colony Road |
| (Apartment or Room Number) |
| Selingsgrove, PA 17870 |
| (City, State, Zip Code) |

| Mailing Address of Attorney or Representative |
|---|
| Jeffrey Bubier, INS Ass't. Dist. Counsel |
| (Name) |
| 3400 Concord Road |
| (Street Address) |
| |
| (Suite or Room Number) |
| York, PA 17402 |
| (City, State, Zip Code) |

> **WARNING:** An attorney or representative will not be recognized as counsel on appeal and will not receive documents or correspondence in connection with the appeal, unless he/she submits a completed Form EOIR-27.

## CERTIFICATE OF SERVICE
(Must Be Completed)

10.

I  Jeffrey T. Bubier, Assistant District Counsel   mailed or delivered a copy of this notice of app
       (Name)

on  June _ , 2000                    to  Maher Omari
       (Date)                                   (Opposing Party)

at  Snyder County Prison, 600 Old Colony Road, Selinsgrove, PA 17870.
       (Address of Opposing Party)

SIGN HERE  →  X _____

Signature of Person Appealing
*(or attorney or representative)*

*Exh # 14*

## TO WHOM IT MAY CONCERN

DATE_ 04-04-2000

MY name is Nabila,Alkhatib.Iam a mother of Maher,Omari Iwould like to inform to any one who is concern with respect that Iam LOOKing forward in anytime to welcoming my lovely SON MAHER,OMARI TO stay and live with us in our house at this location:

2471 W Ball road #17
Anahiem, CALIFORNIA 92804
Phone#(714)-527-8244

sincerly

*NABILA ALKHATIB*

Nabila,Alkhatib

STATE OF _California_

COUNTY OF _Los Angeles_

On _April 5, 2000_ before me, _Connie R. Bermudez_
(Name, Title of Officer)

personally appeared _Nabila Alkhatib_

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Connie R. Bermudez_
(Signature of Notary Public)



(This area for notarial seal)

**J & J ROOTER SERVICE & DRAIN**
3629 WEST 118TH STREET
INGLEWOOD, CA. 90303
(310) 675-5835 BUS.

April 18, 2000

Dear : Mr. Maher Omari

In regards to your application that you have submitted to our company , We will concern your application and review your references that you have sumitted to us, we will contact you for a interview after looking over your application. again thank you for applying with our company. If you have any questions please contact us at the above number .

Thank You

Mangerment.



بسم الله الرحمن الرحيم

# Sindbad Ranch

# Mid East Croceries

Tues.- Sat. 9-8 Sun.9-7
Closed Monday

Abdo Khouraki
(714) 533-3671 512 S. Brookhurst
Fax (714)533-3673          Anaheim CA 9280

To Whom It May Concern:

I Would like Maher to work for me at Sindbad Ranch .As
Soon as he arrives to California If you have any questions,
Please contact us at (714)533-3671

Sincerely Yours,

EX L

July 14,1999

NABILA S. ABED MUTI
2471 W BALL RD # 17
ANAHEIM CA 92804.


To whom It may concern,

  I Nabila S.Abed Muti,mother of Omari Maher,am giving this
statement for the Immigration purposes in my son's proceedings.

  I hearby testify that my son's life will be in danger if he
returns to Jordan.This is due to an incident with his late girlfrie
that was killed once her tribe came to information that she had
slept with my son without being married to him,wich constitutes
a major and shamful act in the eyes of the tribes,in other words
they consider it a crime worthy of death.
  Since that incident happend,almost a decade ago,my son has tried
to live in hidings but while in Jordan in 1989,he was spotted by
some of the tribe members who shot him,but luckily the bullet hit
him in the leg where he still bears a scar.

  The tribes never forget what they call "Thair" (Revenge),they
carry it for years and generations until it is fullfilled;that is
why my son's life is and will remain in danger in that country.

  I beg of you to protect my son'slife by not sending him back
to Jordan,because the gouverment over there will not attempt to sto
the tribes from carrying on their Thair out of fear of conflict
with the tribe members who are always heavyly armed.

Respectfully Submitted
  NABILA ALKHAT.'b
Nabila S. Abed Muti.

**STATE OF CALIFORNIA**                }
                                       }ss.
**COUNTY OF ORANGE**                   }

On July 14, 1999 before me, Marie Holden, Notary Public, personally appeared Nabila Al Khatib _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s) or entity upon behalf of which the person(s) acted, executed the instrument.

**WITNESS my hand and official seal.**

MARIE HOLDEN
COMM. #1099983
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. JUNE 6, 2000

Signature _Marie Holden_

(This area for official Notarial Seal)



*Ex* ⋀

**GEORGE C. NYE**
WARDEN

# SNYDER COUNTY PRISON
## 600 OLD COLONY RD.
## SELINSGROVE, PA 17870
### PHONE: (570) 374-7912
### FAX : (570) 374-7921

**LARRY E. WOMER**
DEPUTY WARDEN

DATE: 4/20/00

TO: Whom It May Concern

FM: George C. Nye, Warden

RE: Omari, Maher

Frequently, INS inmates housed at this facility request a recommendation from staff to be used by the inmate for purposes of deportation hearings and proceedings.

It is the policy of the Snyder County Prison to refrain from preparing "letters of recommendation" unless the INS makes such a request. However, in lieu of a letter of recommendation, the Warden of the Snyder County Prison does prepare a "letter of facts" for an inmate's use.

This letter of facts has been prepared at the request of the above named inmate and covers the following items. This letter *is not* to be perceived as a recommendation of any kind.

DATE OF COMMITMENT TO THE SNYDER COUNTY PRISON: 6/22/99

CONDUCT RECORD: (If no infraction reports have been noted, indicate "clear" conduct.) (If an inmate has not maintained "clear" conduct, indicate the date of the infraction, the nature of the infraction, and the disposition of the infraction by the Discipline Hearing Committee.)

Inmate Omari has maintained a clear conduct record while incarcerated.

WORK ASSIGNMENTS:
He has worked as an orderly. His duties have included maintaining the sanitation levels of the main corridor and cleaning the shower and day room in his housing unit. He is currently unassigned.

PROGRAM PARTICIPATION: (Include all educational programs as well as drug abuse classes, etc.)

Mr. Omari participates in Islamic services.

OTHER NOTEWORTHY ITEMS:

None

OVERALL GENERAL ADJUSTMENT WHILE CONFINED:

Mr. Omari's adjustment at this facility has been good.

07/19/99    12:23    PERSHING ROAD → 7178401453

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE 1130    IMMIGRANT PETITION FOR RELATIVE, |
|---|---|---|
| WAC-99-148-53967 | | FIANCE(E) OR ORPHAN |
| RECEIVED DATE | PRIORITY DATE | PETITIONER    A76 247 991 |
| April 22, 1999 | | ABED MUTI, NABILA S |
| NOTICE DATE | PAGE | BENEFICIARY  A76 766 732 |
| April 26, 1999 | 1 of 1 | OMARI, MAHER A |

NABILA S ABED MUTI
2471 W BALL RD #17
ANAHEIM CA 92804

Notice Type:  Receipt Notice

Amount received: $ 110.00
Section: Unmarried child 21/older of
permanent resident
203(a)(2)(B) INA

The above application or petition has been received by us. It normally takes 120 to 180 days from the date of this receipt for us to process this type of case. Please notify us immediately if any of the above information is incorrect. 

We will send you a written notice as soon as we make a decision on this case. You can also use the phone number below to obtain case status information direct from our automated system. 24 hours a day with a touch-tone phone and the receipt number for this case (at the top of this notice).